Ferris J. ALEXANDER and Benedict Jochim, Plaintiffs,

and

Vegas Cinema Corporation of Minneapolis, Inc., dba Avalon Theatre, Plaintiff-Intervenor,

v.

CITY OF MINNEAPOLIS, a municipal corporation; William A. Nordrum, Jr., individually and as Zoning Supervisor for the City of Minneapolis; and Anthony Bouza, individually and as Chief of Police of the City of Minneapolis, Defendants.

Civ. No. 4–81–337.

United States District Court, D. Minnesota, Fourth Division.

Feb. 19, 1982.

Randall D. B. Tigue and Benjamin Houge, Minneapolis, Minn., for plaintiffs.

John H. Weston, Robert A. DePiano, Brown, Weston & Sarno, Beverly Hills, Cal., on behalf of plaintiff-intervenor.

Allèn B. Hyatt, Asst. City Atty., Minneapolis, Minn., for defendants.

## MEMORANDUM OPINION AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiffs Ferris J. Alexander and Benedict Jochim brought this action under 42 U.S.C. § 1983 for declaratory and injunctive relief against defendants City of Minneapolis, William A. Nordrum, Jr., and An-

thony Bouza, alleging violations of their First and Fourteenth Amendment rights. Subsequently, plaintiff Vegas Cinema Corporation of Minneapolis, Inc., dba Avalon Theatre (Avalon), intervened pursuant to Fed.R.Civ.P. 24. The case arises from the implementation of Minneapolis Code of Ordinances § 540.410, a zoning ordinance which would prevent the plaintiffs, owners or operators of various "adult" bookstores and motion picture theaters, from continuing most of these operations in the same manner or location. Jurisdiction is alleged under 28 U.S.C. § 1343.

Plaintiffs assert that their activities are entitled to constitutional protection under the First and Fourteenth Amendments. They contend that Minneapolis Code of Ordinances § 540.410 [1] is unconstitutional on its face and as applied because it is an unlawful prior restraint of free speech and press, denies the plaintiffs equal protection of the law, is unconstitutionally overbroad and vague, and is an establishment of religion, all in violation of the First and Fourteenth Amendments.

Defendants contend that § 540.410 neither denies equal protection nor constitutes an establishment of religion. They claim the ordinance is drafted narrowly and precisely and is not unconstitutionally vague or overbroad. Finally, they assert that the ordinance only has an incidental impact on the exercise of free speech and press that is justified by the exercise of the city's zoning powers and is permitted under *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

Shortly after this action was commenced, a hearing was held on plaintiffs' request for a temporary restraining order, and an order was issued temporarily preventing defendants from enforcing the challenged ordinance against the plaintiffs. The parties agreed to consolidate the hearing on plaintiffs' request for preliminary injunction with trial on the merits.

Prior to trial, defendants requested, and were granted, two continuances so that

---

**1.** Minneapolis Code of Ordinances § 540.410 is set out in its entirety in the appendix. Herein-

after it will be referred to simply as § 540.410.

their expert could adequately prepare to testify to relocation sites available for the plaintiffs' businesses under the challenged ordinance. During this time, neither party objecting, the Minnesota Civil Liberties Union was granted leave to file a brief as *amicus curiae.* The parties also stipulated to the intervention of plaintiff Avalon and the entry of a temporary restraining order protecting Avalon from enforcement of the ordinance until a final decision by the court on the merits.

During the week-long trial, 13 witnesses testified, and 47 exhibits were received into evidence, including a videotape of proposed relocation sites and several maps of the City of Minneapolis depicting the effect of § 540.410 and other zoning ordinances. Upon conclusion of the trial the parties requested, and the court granted, leave to submit post-trial memoranda. The parties also agreed to the extension of the temporary restraining order applying to plaintiffs Alexander and Jochim until a final decision by the court on the merits.

The court having considered all testimony and exhibits presented at trial, having observed the demeanor of the witnesses and weighed their credibility, and having reviewed the arguments and memoranda of counsel for the parties and *amicus curiae,* now enters this Memorandum Opinion and Order for Judgment as its findings of fact and conclusions of law as required under Rule 52 of the Federal Rules of Civil Procedure.

## I. BACKGROUND FACTS

### A. Parties

Plaintiff Ferris J. Alexander (Alexander) has an ownership interest in six adult bookstores in Minneapolis. They are located at 401 East Hennepin Avenue, 624 Hennepin Avenue, 429 Hennepin Avenue, 327 East Lake Street, 735 East Lake Street, and 2968 Lyndale Avenue South. He also has an interest in four adult motion picture thea-

ters in Minneapolis: a two-screen theater located at 735 East Lake Street, known as the Rialto, a three-screen theater at 1021 Franklin Avenue East called the Franklin, and the American and Empress theaters with a total of six screens, located at 614–16 Hennepin Avenue. Plaintiff Benedict Jochim (Jochim) is the manager of these theaters. Plaintiff Vegas Cinema Corporation (Avalon) owns the Avalon theater, located at 1500 East Lake Street, which also features adult films.

Defendant William A. Nordrum, Jr. (Nordrum) is the zoning administrator for defendant City of Minneapolis. Defendant Anthony Bouza is the police chief for the City of Minneapolis.

### B. Minneapolis Code of Ordinances § 540.-410

Section 540.410 was enacted in May of 1977 after public hearings [2] before the Minneapolis City Council and the City Planning Commission and the preparation of a planning commission staff report on the experience of various other cities, including Detroit, in the zoning regulation of adult businesses.

The purpose of the ordinance is stated at § 540.410(a):

[I]t is recognized that there are some uses which, because of their very nature, are recognized as having serious objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances thereby having a deleterious effect upon the use and enjoyment of adjacent areas. Special regulation of these uses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood. . . .
The primary control or regulation is for the purpose of preventing a concentration of these uses in any one area.

The quoted purpose clause is identical to that found in the Detroit ordinance upheld

---

**2.** Differing views were expressed at the hearings, including concerns about deteriorating neighborhoods and the constitutionality of the proposed ordinance. The Council was aware of the Supreme Court's decision in *Young v.*

*American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 . L.Ed.2d 310 (1976), and individual members expressed the need to regulate the adult uses in question rather than to prohibit them.

in *Young v. American Mini Theatres*, 427 U.S. 50, 54, n. 6, 96 S.Ct. 2440, 2444, n. 6, 49 L.Ed.2d 310 (1976).

The ordinance identifies the following uses with such serious objectionable operational characteristics: adults-only bookstores, adults-only motion picture theaters, massage parlors, rap parlors, and saunas (hereinafter "adult uses" when referred to collectively).

An adults-only bookstore is:

an establishment having forty (40) percent or more of its dollar volume in trade, [in] books, magazines and other periodicals which are distinguished or characterized by their principal emphasis on matters depicting, describing or relating to nudity, sexual conduct, sexual excitement or sadomasochistic abuse, . . . for sale to patrons therein.

§ 540.410(b)(1).

Similarly, an adults-only motion picture theater is defined as:

An enclosed building used for presenting, in forty (40) percent or more of its programs, materials distinguished or characterized by and emphasis on matters depicting, describing or relating to nudity, sexual conduct, sexual excitement or sadomasochistic abuse, . . . for observation by patrons therein.

§ 540.410(b)(2).

The ordinance provides for two primary restrictions of the regulated adult uses. First, no adult use may be operated within 500 feet of any of the following: a residentially zoned or office-residence zoned district, a church, a licensed day care facility, elementary or high schools, and public educational facilities serving persons 17 or younger. § 540.410(c). Second, no adult use may operate within 500 feet of another

adult use. § 540.410(d). If more than one adult use is within 500 feet of another, in an otherwise permissible location, "the use of longest continuous operation" is permitted to remain. § 540.410(g).[3]

The 1977 ordinance allows for "amortization" of any adult use in existence at the time. These uses could lawfully continue until July 1, 1981. § 540.410(f). The city council could extend the compliance date upon the recommendation of the zoning administrator on a showing that discontinuance of the adult use would result in a taking of property. *Id.* Nordrum testified that he would recommend an extension only if satisfied that the applicant's investment in the use had not been recouped and that a different type of business could not be operated at that location.

The challenged ordinance does not operate in isolation. Other ordinances play a role in how § 540.410 affects the plaintiffs. The adult bookstores and theaters operated by the plaintiff are also subject to zoning restrictions applicable to all bookstores and theaters. Motion picture theaters of any type may only operate in areas zoned B3C, B3S, B4C, or B4S. Bookstores may locate in the areas zoned for theaters plus the additional districts zoned B2, B2S, B3, B4, B4–1, or B4–2.

Nordrum testified that in applying § 540.410, he classifies uses mentioned in the ordinance by reference to the "primary" use of the facility rather than a use which he judges to be "accessory."[4] (The ordinance itself does not contain the words primary, principal or accessory use.) Nevertheless, he has classified at least two locations as "state licensed day care facilities" although the actual day care operations are a small part of the building's use (the Galaxy office building at 330 South Second

---

**3.** For example, two bookstores and one rap parlor are located near 11th Street and Hennepin Avenue within 500 feet of one another. Except for the proximity of these three uses, 11th and Hennepin is a permissible location for an adult use. However, under the ordinance, only the oldest of the three uses, whether bookstore or rap parlor, may continue to operate.

**4.** Section 522.40 of the Code of Ordinances provides in relevant part:

Definitions. As used in the zoning code, the following words and phrases shall mean:
*Accessory building or use.* A building or use which:
(1) Is subordinate to and serves the principal building or principal use.
(2) Is subordinate in area, extent or purpose to the principal building or principal use served, . . .

Avenue and a senior citizen high-rise apartment building at 115 South Second Avenue). He also testified that once an adult use is located in a permissible area, it is not rendered unlawful by the subsequent establishment within 500 feet of a use that could prohibit the adult use (i.e., school, church, licensed day care facility, or public educational facility serving persons under 18). Rather, Nordrum testified that an adult use would continue as a "non-conforming use." [5]

Operation of an adult use in violation of § 540.410 is subject to a fine of up to $500 and imprisonment of up to 90 days. Minneapolis Code of Ordinances §§ 1.30 and 534.-430. Each day's violation is deemed a separate offense. *Id.*

Prior to the ordinance's effective date of July 1, 1981, the Minneapolis zoning office identified thirty adult uses, including all of the plaintiffs' bookstores and three of their theaters,[6] as being in violation of § 540.410. Each of the uses was notified of the violation and the deadline for compliance. Plaintiffs did not appeal the determination of the zoning administrator or apply for extensions under the ordinance, except Avalon applied for an extension for its theater. (No action has been taken by the zoning administrator on the application.)

## II. THE EFFECT OF THE ENFORCEMENT OF § 540.410

### A. Prohibited Uses

There are presently five adult motion picture theaters in Minneapolis. Under § 540.410 all five are in prohibited locations and must terminate their present operation. One of these prohibited theaters belongs to Avalon; the other four are owned by Alexander and managed by Jochim.

Of the ten adult bookstores operating in Minneapolis, at least seven, and possibly nine, are prohibited and must terminate their present operations. Alexander owns six of them, of which at least three, and possibly five,[7] are prohibited.

Thirteen out of a total of fifteen sauna or massage parlors are prohibited under § 540.410, as are five of six rap parlors. The effect of § 540.410 on these institutions is not challenged in this lawsuit, but any which are in violation compete under the ordinance with the plaintiffs for available relocation sites on a "first come, first served" basis, and bookstores and theaters may not relocate within 500 feet of a sauna, massage parlor, or rap parlor. Preference under the ordinance is to the first established use in the area regardless of whether that use may have claim to First Amendment protection.

In total, of thirty-six adult uses operating in Minneapolis during the "amortization period" of § 540.410, thirty or thirty-two would have been in violation on July 1, 1981, and have to terminate their offending use. Any proposed new adult use would not be able to operate under § 540.410 unless it could locate in one of the limited number of sites available in the city under

---

5. Minneapolis Code of Ordinances § 532.20 provides in part:

Any ... building, structure or use which shall become nonconforming upon the adoption of this zoning code on July 19, 1963, or of any subsequent amendments thereto, may be continued subject to the regulations which follow.

6. All five theaters are now considered in violation. Nordrum testified that the theaters at 614–16 Hennepin Avenue opened after the zoning office's initial determination of noncomplying uses. The zoning office has also changed its position regarding two of plaintiffs bookstores, located at 429 and 624 Hennepin Avenue. Initially they received letters advising that they were not in compliance; now Nordrum believes they are in compliance.

7. Whether three or five are prohibited depends upon the interpretation of § 540.410. Alexander's bookstores at 429 and 624 Hennepin Avenue are lawful according to Nordrum. Under plaintiffs' view these stores are within 500 feet of "public educational facilities which serve persons seventeen (17) or younger." They are within 500 feet of the Hennepin Center for the Arts or the Minneapolis Business College.

The continued existence of the sixth bookstore, located at 401 E. Hennepin Avenue, is also in jeopardy. The store is leased from the local lodge of the International Order of Oddfellows (I.O.O.F.) by Alexander, a member in good standing of the I.O.O.F. The national I.O.O.F. is suing to cancel the lease because it objects to the sale of adult materials.

the ordinance, and all of the displaced uses were potential competitors for remaining sites.

## B. Alternatives to Closing Available to Prohibited Uses

In order to avoid prosecution for violation of § 540.410, a prohibited use must close or come into compliance in one of three potential ways. First, the ordinance provides that an administrative extension can be sought for a taking of an unrecouped business investment. § 540.410(g). Second, the nature of the business could be changed to fall outside the definition of an adults-only bookstore or motion picture theater. Finally, plaintiffs could move their business to an area still permitted for adult uses under § 540.410.

An administrative extension for compliance with § 540.410 may be granted by the City Council upon the recommendation of the zoning administrator. § 540.410(g). Fourteen adult uses have applied for extensions, but no decisions have yet been made. Nordrum testified that he would only recommend such an extension if an applicant could demonstrate that there is no other possible business use for the facility.

A second option to avoid prosecution for violation of § 540.410 is for the plaintiffs to change the nature of their business or to reduce the level of adult materials and films. Bookstores with less than "forty (40) percent ... of ... programs" relating to adult themes do not fall within the ordinance. § 540.410(b)(2). The ordinance itself contains no time period for measuring the proportion of adult trade. However, §§ 1.30 and 534.430 of the Minneapolis Code of Ordinances provide that each day's noncompliance is deemed a separate offense.

Plaintiff Alexander testified, from his 25 years of experience in adult bookstores, that the higher price of adult material would require him to reduce the stock of adult materials well below 40 percent to insure that the dollar volume of trade would fall below 40 percent. He also testified to the impossibility of predicting the proportion of adult trade on a given day, and a constant unavoidable risk of violation rendering the option impractical.

David Friedman, Chairman of the Adult Films Association of America and a 25 year veteran of the adult and general film business, testified that exhibiting both adult and general release films would be impractical and would create disadvantages in bidding for general release films. This includes the inability to guarantee sufficient showings and audience capacity to compete with general release film houses and the total exclusion of adult theaters from bidding on films by at least one major distributor. He testified to the operational difficulties and increased overhead expenses of such an endeavor. Finally, he testified that exhibiting both general release and adult films created a significant risk of violation of Minn.Stat. § 617.294.[8]

Another option for plaintiffs to remain in business is relocating to a site permitted under § 540.410. In the entire city of Minneapolis there are nine individual areas lawful for relocation of the approximately thirty displaced adult businesses or the location of new adult businesses. The only large area is in downtown Minneapolis. There is a two to three-block area northeast of downtown containing the Winslow House condominium building and an established car dealer lot. An approximately six-block area, containing a Target department store and the Minnehaha Mall, exists on East Lake Street. All other remaining areas are each about one block in size. These include a K-Mart store, a National food store, and the Hi-Lake shopping center.

The size of the downtown area lawful for adult uses is disputed by the parties. Plaintiffs contend that there are a number of locations in addition to those already identified by the zoning office which are unavail-

---

**8.** Minn.Stat. § 617.294 provides in part:
  It is unlawful for any person knowingly to ... admit a minor for a monetary consideration to premises whereon there is exhibited, a

motion picture, ... which, in part, depicts nudity, sexual conduct, or, sadomasochistic abuse and which is harmful to minors.

able for adult uses because they are within 500 feet of one of the triggering uses of the ordinance. The evidence established that a number of educational facilities operating in this area and serving persons under age 18 have not been considered by the zoning office to fall under § 540.410 because they primarily serve older students. Some are publicly-funded institutions such as Mac-Phail Center for the Arts at LaSalle Avenue and South 12th Street (part of the University of Minnesota), Minneapolis Community College at 1501 Hennepin Avenue, and Minneapolis Technical Institute at 1415 Hennepin Avenue. Others open to the public include Minnesota School of Business at 11 South Fifth Street, Minneapolis Business College at 1011 Marquette Avenue South, and the Hennepin Center for the Arts at Hennepin Avenue and South Sixth Street. (This center is used for performing as well as training.) Evidence also showed that the Augsburg Publishing House at 426 South Fifth Street contains a fourth floor chapel offering regular services, but the location has not been classified as a church by the zoning office.[9] If these facilities are incompatible uses under § 540.410, approximately 15 additional blocks of the downtown area would be prohibited for relocation of adult uses.

Much of the area theoretically available for relocation could not in fact contain an adult use because of the ordinance's additional restriction that these uses may not operate within 500 feet of one another. Nordrum testified that there are, at most, twelve relocation sites in the areas lawful for adult use. The great majority of these are in the downtown Minneapolis location. His estimate does not consider the actual availability of sites or the economic feasibility of the sites for businesses such as adult bookstores and theaters.

As far as actual available sites, defendants' expert Robert Boblett was able to identify only three [10] possible relocation sites in Minneapolis that were vacant, for rent, or for sale. Only two were zoned for motion picture theaters. All three sites are downtown. His testimony was not that the sites were actually feasible for plaintiffs' operations, but that he found two sites available for plaintiffs' five-movie theaters and three sites (including the two for theaters) available for Alexander's three to five bookstores.

A number of witnesses with considerable experience in adult bookstore and theater businesses testified to the locational requirements for successful adult theaters and bookstores. They include Alexander, Friedman, and Kenneth Schaffer, whose job includes finding locations nationwide for Avalon. According to their testimony the type of location needed is at street level in the vicinity of other retail businesses, with a lot of vehicular and pedestrian traffic, well lighted and close to transportation. The theaters also have certain space requirements. By these criteria, the witnesses concluded that at least two of the three sites identified by Boblett were practically and financially unsuitable for adult theaters and bookstores.

Aside from the available sites identified by the defendants' expert, plaintiffs' expert, Bradley Bjorklund, a real estate appraiser, testified that there were only three or four spots (all in downtown Minneapolis) which he believed to be minimally accepta-

---

9. Plaintiffs also contend there is a church located in the Salvation Army building at North Seventh Street and First Avenue North, but the evidence did not establish the existence of a church or chapel there. Similarly, they contend there are day care facilities located in the YWCA and near St. Mary's Basilica but offered no proof.

10. He identified five locations, but three of the five are within 500 feet of one another; therefore, only one of the three may be used for an adult use. These sites include: one location at Second Avenue and South Tenth Street that is a second story space with no street level store front and is not zoned for a theater; one location at Ninth Street and Marquette Avenue in a high rent office building not zoned for a theater; and one location at 1010 Second Avenue South. Two of the three usable and available sites identified by Boblett are within 500 feet of the Minneapolis Business College or the Minneapolis Technical Institute and could therefore be prohibited locations under § 540.410(c). The third, at 125 North First Street, is located in the warehouse district of Minneapolis which is not heavily trafficked or well lit.

ble locations for a retail business such as the plaintiffs'. Two of these locations are not zoned for motion picture theaters, and there is no evidence that any of these sites are actually or potentially available. In his opinion much of the 50–65 block area of downtown theoretically available for relocation was either not suitable for a retail business (warehouse area, areas with no foot traffic, etc.) or not available for adult businesses (financial and commercial centers).

## III. DISCUSSION

■■■ At the outset, it is important to recognize the broad power of the City of Minneapolis to zone for the welfare and development of its community. A city's zoning powers are a valuable tool in its efforts to achieve a high quality of life for its citizens. Nonetheless, this power must be exercised within constitutional limits.

> The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both the urban and rural communities. But the zoning power is not infinite and unchallengeable; it "must be exercised within constitutional limits." Accordingly, it is subject to judicial review; and ... the standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed. [citation omitted]

*Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981).

In this case plaintiffs contend that § 540.410 acts as a prior restraint on their First Amendment rights. The plaintiffs in operating their bookstores are protected by the First and Fourteenth Amendments to the United States Constitution. *See Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Their right to exhibit motion pictures is similarly protect-

ed. *See Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). The First Amendment does not protect obscene materials (*Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)), but there is no contention that the city is trying to control obscenity with this ordinance. Minneapolis concedes that § 540.410 regulates bookstores and theaters fully entitled to First Amendment protection and that the ordinance is not aimed at regulation of obscene materials.

A zoning law which is alleged to threaten First Amendment rights is subject to close scrutiny to pass constitutional muster.

> [W]hen a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest.

*Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 2182–83, 68 L.Ed.2d 671 (1981).

This court need not weigh anew the importance of the interest asserted by Minneapolis to consider the extent of zoning regulation permitted by such an interest since the Supreme Court has already done so. The exact interest was expressed by the City of Detroit in *Young v. American Mini Theatres,* 427 U.S. 50, 54, n. 6, 96 S.Ct. 2440, 2444, n. 6, 49 L.Ed.2d 310 (1976).

In *Young* the Supreme Court upheld as constitutional a Detroit zoning ordinance which provided that adult movie theaters could not locate within 1,000 feet of any two other regulated uses.[11] That ordinance did not affect existing establishments but only the location of new ones. (*See 427 U.S. at 71, n.35, 96 S.Ct. at 2453 n.35). In upholding that ordinance under the First Amendment on the facts presented, the Court clearly indicated that the effect of such ordinances on access to protected materials and activities is of critical importance. The plurality opinion observed in a section joined in by Justice Powell that:*

11. The ordinance was an amendment to an Anti-Skid Row Ordinance that had been adopted ten years earlier by the Detroit Common Council. It added adult businesses to a group

of previously regulated uses such as cabarets, hotels, bars, pawn shops, pool halls, public lodging houses, second-hand stores, shoe shine parlors, and taxi-dance halls.

The ordinances are not challenged on the ground that they impose a limit on the total number of adult theaters which may operate in the city of Detroit.... Viewed as an entity, the market for this commodity is essentially unrestrained.

427 U.S. at 62, 96 S.Ct. at 2448.

Similarly, Justice Powell's concurring opinion, permitting a majority for upholding the ordinance, noted:

> The primary concern of the free speech guarantee is that there be full opportunity for expression in all of its varied forms to convey a desired message. Vital to this concern is the corollary that there be full opportunity for everyone to receive the message.
>
> . . . . .
>
> In this case, there is no indication that the application of the Anti-Skid Row Ordinance to adult theaters has the effect of suppressing production of or, to any significant degree, restricting access to adult movies.
>
> . . . . .
>
> At most the impact of the ordinance on these interests [of free expression] is incidental and minimal. Detroit has silenced no message, has invoked no censorship, and has imposed no limitation upon those who wish to view [adult films].... Nor is there any significant overall curtailment of adult movie presentations, or the opportunity for a message to reach an audience.... the number of adult movie theaters in Detroit will remain approximately the same....

427 U.S. at 76, 77, and 79, 96 S.Ct. at 2455 and 2456.

It is clear from *Young* that Minneapolis may zone the location of adult theaters and bookstores in order to control blight on surrounding neighborhoods only so long as the zoning law does not have the effect of significantly reducing their numbers and availability to the public. And subsequent to *Young*, a zoning ordinance was struck down by the Supreme Court because it had the effect of totally suppressing the availability of nude dancing. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176 (1981).

Recently the Eighth Circuit, sitting *en banc*, considered the limitations on a city's zoning power suggested by *Young*. *Avalon Cinema Corporation v. Thompson*, 667 F.2d 659 (8th Cir. 1981), held unconstitutional a North Little Rock ordinance that prohibited movie theaters showing films depicting sexual contact from operating within 100 yards of a church, school, residentially zoned area and adjacent public parks. The ordinance "had the effect of virtually suppressing public access to sexually oriented (but nobscene) adult entertainment." 667 F.2d at 662.

The court is respectful of Minneapolis's interest in preserving the quality of its neighborhoods, but the ordinance may only be upheld if it does not act to suppress the First Amendment activity it regulates. The evidence at trial established that § 540.410 goes well beyond a mere locational restriction; it would significantly curtail the public's access to adult books and films.

Unlike *Young* where the ordinance upheld did not affect existing adult theaters, § 540.410 has a significant effect on adult bookstores and theaters in Minneapolis. Of fifteen bookstores and theaters, at least twelve, and possibly fourteen, are unlawful under § 540.410. All five of plaintiffs' theaters are at prohibited locations, as are three or five of Alexander's six bookstores. Only two realistic alternatives are available to almost every adult bookstore and theater in Minneapolis: close or move.

An administrative extension is not realistic. None have been granted, and based upon the zoning administrator's testimony, it is unlikely any would be. All fifteen theaters and bookstores are located in retail areas of the city with considerable foot and vehicular traffic, and the sites could be used for other businesses. Thus, according to his testimony, the zoning administrator would not recommend an extension. Moreover, if the business were converted in order to remain at a location, the public's access to adult books and theaters would be just as curtailed as if the business closed.

Furthermore, the "forty percent or more" definition of adult theaters and bookstores

does not realistically permit the theaters and bookstores to continue by reducing their trade in adult fare. The 40 percent requirement is enforceable on a daily basis. The evidence showed that it would be financially unfeasible and impractical for theaters to operate with 61 percent of daily showings in general films and the balance in adult films. For bookstores the sale of less than 40 percent in dollar volume trade could never be assured under a system of daily enforcement. On any given day a bookstore which sold an adult magazine as its first sale of the day would risk violation of the ordinance if it didn't manage to sell nonsexually-oriented materials for the rest of the day.

The evidence established that affected theaters and bookstores would be hard pressed to find permitted locations to move to, and many would have to close under the ordinance, and there would be no locations available for new bookstores and theaters. This ordinance is in stark contrast to the ordinance upheld in *Young* in which a "myriad" of locations were available to new theaters and bookstores, and existing ones were completely unaffected. (*See* 427 U.S. at 71, n. 35, 96 S.Ct. at 2453, n. 35.)

The evidence at trial also revealed that there exist a number of triggering uses which fall within the language of the ordinance but which are not presently relied on by the city or the zoning administrator in identifying existing uses that are prohibited under the ordinance. MacPhail Center for the Arts, Minneapolis Community College, Minneapolis Technical Institute, Minnesota School of Business, Minneapolis Business College, and the Hennepin Center for the Arts are all "public educational facilities which serve persons age seventeen (17) or younger" in the sense that they provide educational services to members of the public, some of whom are 17 or younger. As noted before, some are also publicly funded.

These facilities come within the literal description of one type of facility within 500 feet of which no adult use can locate under § 540.410(c), as does the chapel in the Augsburg Publishing House. The ordinance does not define "church" to mean a separate building or one primarily used for worship services. Nor does it specify what is meant by a "public educational facility" or that it only applies to facilities where all or most of the student body is 17 or under. While Nordrum testified that he classifies uses under the ordinance by reference to the primary use, he does not follow this policy consistently, for he has classified two locations as triggering uses even though day care centers on the premises constitute a very small part of the building's use. *See* pp. 1165–1166 *supra*. It is also clear that the status of uses under the ordinance is subject to reclassification by the city. *See* note 6 *supra*.

If the ordinance were to be enforced with these facilities also classified as triggering uses, an even greater restraint would result. Nine of the ten existing bookstores would be prohibited, including five of Alexander's six stores, and the area of downtown even theoretically available for relocation would be reduced by some fifteen blocks. (And only one available site for relocation would have been shown by defendants' expert.) There is no guarantee to plaintiffs that the ordinance would not in fact be so applied to prohibit their relocation at a site within 500 feet of one of these facilities.

The restrictive effect of § 540.410 is evident, however, even if one accepts without question the testimony most favorable to the city. Nordrum testified to, at most, twelve relocation sites possible under the ordinance, and this testimony did not consider whether the sites were actually available or economically feasible for the operation of a retail business. He testified that two adult bookstores near the Hennepin Center for the Arts and the Minneapolis Business College could remain, leaving only twelve bookstores and theaters looking to relocate. These twelve theaters and bookstores would have to compete with eighteen dislocated saunas, rap parlors, or massage parlors for the twelve relocation sites he claims exist. Even under the scenario most favorable to the city, it is clear that there are no relocation sites available for all the prohibited theaters and bookstores. What is more, there would not be a single location in the entire city for the opening of new theaters or bookstores.

A realistic evaluation of all of the evidence shows that § 540.410 is far more restrictive in limiting adult theaters and bookstores. Economic and practical realities cannot be ignored in evaluating the actual effect of the ordinance. The defendants' expert, after several months of searching and two continuances of the trial, could only locate three actual available sites.[12] Only two are zoned for theaters, and two may not be lawful because of their proximity to the Minneapolis Technical Institute and the Minneapolis Business College. Plaintiffs' expert concluded there were three or four other areas which were "minimally acceptable," although not necessarily available, as sites for location of a retail business. Only two of these additional sites are zoned to allow operation of a theater. There was substantial testimony showing that few of the areas lawful under § 540.410 had the minimal traffic or neighborhood characteristics required for an adult business to survive. And there was evidence that adult businesses are not desired tenants at some locations and for some property owners, further restricting relocation possibilities.

It is clear from the evidence produced at trial that enforcement of § 540.410 would have the effect of substantially reducing the number of adult bookstores and theaters in Minneapolis. At best there are only a handful of relocation sites available for the twelve or fourteen displaced bookstores and theaters which must compete against eighteen displaced saunas, massage parlors, and rap parlors for these sites. Almost all of plaintiffs' theaters and bookstores were in existence at the time the ordinance was passed (Alexander's Aster theater at 607 Hennepin Avenue existed when the ordinance was passed but was condemned; his theaters at 614–616 Hennepin were apparently opened subsequent to the passage of the ordinance, but prior to the amortization deadline of July 1, 1981, § 540.410(f)). The evidence shows that only a very limited number would be able to continue in existence under the ordinance and that no new adult bookstores or theaters would be able to open. This is a far cry from *Young* where no existing theaters were affected and a "myriad" of locations were available to new ones.

After the *Young* decision, a number of municipalities have attempted to enact zoning regulations restricting the locations of adult businesses, but they have been found unconstitutional where they have the effect of restricting public access to First Amendment protected materials.[13] For example, ordinances like § 540.410 which do not exempt existing adult theaters from their provisions have been held unconstitutional. *Ellwest Stereo Theaters, Inc. v. Byrd*, 472 F.Supp. 702 (N.D.Tex.1979); *E&B Enterprises v. City of University Park*, 449 F.Supp. 695 (N.D.Tex.1977). And where there is almost a total ban on new adult theaters or bookstores, the ordinance is invalid. *Avalon Cinema Corporation v. Thompson*, 667 F.2d 659 (8th Cir. 1981); *Keego Harbor Co. v. City of Keego Harbor*, 657 F.2d 94 (6th Cir. 1981); *Bayside Enterprises Inc. v. Carson*, 450 F.Supp. 696 (M.D.Fla.1978). The Minneapolis ordinance combines the worst features of each of these cases, severely limiting both new and existing adult businesses.

The case most like the facts presented here is *Purple Onion, Inc. v. Jackson*, 511 F.Supp. 1207 (N.D.Ga.1981). There a viola-

---

**12.** The fact that actual available sites for relocation of plaintiffs' bookstores and theaters are extremely limited is further demonstrated by the record of condemnation proceedings in July 1980 for the Minneapolis City Center development project. Alexander sought compensation for his adult theater located at 607 Hennepin Avenue, the Aster, which was condemned to make way for the City Center construction. He sought compensation for the value of the theater as a going concern, contending that the business could not be relocated in Minneapolis due to § 540.410. At that time the city was unable to produce a single site available for relocation of his business.

**13.** By contrast, ordinances have been upheld where the evidence established that the zoning regulation only affected location and did not reduce the public's access to protected speech. *Eg., Hart Bookstores, Inc. v. Edmisten*, 612 F.2d 821 (4th Cir. 1979) *cert. den.* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980) and *Genusa v. City of Peoria*, 475 F.Supp. 1199 (C.D.Ill.1979) *aff'd in relevant part, rev'd in part*, 619 F.2d 1203 (7th Cir. 1980).

tion of the First Amendment was found even though existing adult bookstores and theaters were permitted to remain. The ordinance "amortized" all but one of twelve to fifteen existing live adult entertainment establishments out of their locations and allowed relocation sites for only about one-third of the displaced businesses. New live adult entertainment establishments were confined to "very few feasible sites", all located in undesirable industrial areas of the city or in the downtown business district. 511 F.Supp. at 1224. The Minneapolis ordinance is even more restrictive. Twelve or fourteen pre-existing adult theaters and bookstores are amortized out of existence and must compete with eighteen other displaced adult uses for only a handful of locations. Like *Purple Onion*, the only feasible relocation sites for new or old adult businesses are mainly in the downtown business district and surrounding industrial and warehouse areas.

The Minneapolis ordinance goes much further than merely restricting the location of adult bookstores and theaters. Its enforcement would close most existing adult theaters and bookstores and prevent the entry of new ones into the market place.

> To be reasonable, time place and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication.

*Schad v. Borough of Mount Ephraim,* —— U.S. ——, ——, 101 S.Ct. 2176, 2186 (1981).

Minneapolis Code of Ordinances § 540.-410 is unconstitutional as applied to bookstores and movie theaters because it acts to substantially restrict access to First Amendment protected activities.

Because of this conclusion, it is unnecessary to reach plaintiffs' other constitutional challenges. Constitutional questions should not be decided unless they are imperative to a decision of the case. *Doe v. Gillman,* 479 F.2d 646 (8th Cir. 1973).

### DECLARATORY JUDGMENT AND ORDER

Based upon the foregoing,

1. The Court hereby declares Minneapolis Code of Ordinances § 540.410 unconstitutional as applied to theaters and bookstores, for the reasons set forth in the Memorandum Opinion accompanying this Order.

2. Defendants, their agents, officers, employees, and persons acting under their direction and control, are hereby permanently enjoined from enforcing Minneapolis Code of Ordinances § 540.410 against theaters and bookstores by any means.

3. It is further ordered that any claim for attorney's fees and costs be filed by March 12, 1982. *See Obin v. District No. 9,* 651 F.2d 574 (8th Cir. 1981).

LET JUDGMENT BE ENTERED ACCORDINGLY.

### APPENDIX

§ 540.410. Regulated uses. (a) *Purpose.* In the development and execution of this section, it is recognized that there are some uses which, because of their very nature, are recognized as having serious objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances thereby having a deleterious effect upon the use and enjoyment of adjacent areas. Special regulation of these uses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood. These special regulations are itemized in this section. The primary control or regulation is for the purpose of preventing a concentration of these uses in any one area. Uses subject to these controls are as follows:

Adults-only bookstores;

Adults-only motion picture theaters;

Massage parlors;

Rap parlors;

Saunas.

(b) *Definitions.* Whenever used in this section, the following words or phrases shall have the meanings ascribed to them:

(1) *Adults-only bookstore* : An establishment having forty (40) percent or more of its dollar volume in trade, [in] books, magazines and other periodi-

cals which are distinguished or characterized by their principal emphasis on matters depicting, describing or relating to nudity, sexual conduct, sexual excitement or sadomasochistic abuse, as defined below, for sale to patrons therein.

(2) *Adults-only motion picture theater*: An enclosed building used for presenting, in forty (40) percent or more of its programs, material distinguished or characterized by an emphasis on matter depicting, describing or relating to nudity, sexual conduct, sexual excitement or sadomasochistic abuse, as defined below, for observation to patrons therein.

(3) *Massage parlor*: An establishment or place primarily in the business of providing massage services.

(4) *Nudity*: The showing of the human male of female genitals, pubic area or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.

(5) *Rap parlor*: An establishment or place primarily in the business of providing nonprofessional conversation or similar services for adults.

(6) *Sauna*: An establishment or place primarily in the business of providing (i) a steam bath and (ii) massage services.

(7) *Sexual conduct*: Acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's unclothed genitals, pubic area, buttocks or, if such person be a female, her breast.

(8) *Sexual excitement*: The condition of human male or female genitals when in a state of sexual stimulation or arousal.

(9) *Sadomasochistic abuse*: Flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

(c) [*Distance-restriction from certain districts and facilities.*] No adults-only motion picture theater, adults-only bookstore, massage parlor, rap parlor or sauna shall be operated or maintained within five hundred (500) feet of a residentially zoned district, an office-residence zoned district, a church, a state-licensed day care facility and public educational facilities which serve persons age seventeen (17) or younger, an elementary school or a high school.

(d) [*Distance restriction between uses.*] No adults-only motion picture theater, adults-only bookstore, massage parlor, rap parlor or sauna shall be operated or maintained within five hundred (500) feet of any other adults-only theater, adults-only bookstore, massage parlor, rap parlor or sauna.

(e) [*Measurement.*] The distance limitations in subsections (c) and (d) shall be measured in a straight line from the main public entrances of said premises, or from the lot lines of properties in residentially or office-residential zoned districts.

(f) *Amortization of nonconforming uses.* Establishments in violation of subsections (c) and (d) shall be permitted by section 532.20 as a nonconforming use. As to those establishments which have a nonconforming use status, the provisions of sections 532.30 through 532.100 shall apply and, in addition, such use shall become unlawful on and after July 1, 1981.

(g) [*Investigation of existing uses*] Prior to January 1, 1979, the zoning administrator shall cause to be investigated the status of every adults-only motion picture theater, adults-only bookstore, massage parlor, rap parlor and sauna in the city, as to length of continuous operation and determine which uses would become unlawful on July 1, 1981, with the use of longest continuous operation having precedence over uses subsequent in time or duration. Appeals from the determination of the zoning administrator shall be pursuant to sections 534.40 through 534.60 and 534.200. The city council may, upon receiving the recommendation of the zoning administrator, extend

said date where the appellant establishes that discontinuance of the use on July 1, 1981, results in a taking of a valuable property interest held by the appellant on the effective date of this section without the payment of just compensation. (77–Or–110, § 1, 5–13–77).