Ferris J. ALEXANDER and U.S. Video, Inc., a Minnesota corporation, Plaintiffs,

v.

The CITY OF MINNEAPOLIS, a municipal corporation, Defendant.

No. 3–88 CIV 808.

United States District Court, D. Minnesota, Third Division.

May 22, 1989.

Randall D.B. Tigue, Minneapolis, Minn., for plaintiffs.

City of Minneapolis Attorney's Office by David M. Gross, Asst. City Atty., Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

ALSOP, Chief Judge.

### I. INTRODUCTION.

This case involves a constitutional challenge, via 42 U.S.C. § 1983, to the November 7, 1986, amendment to section 540.410 of the zoning ordinance of the City of Minneapolis.[1] That amendment regulates the possible locations of various adults-only facilities within the City of Minneapolis. Basically, the ordinance provides that adults-only bookstores, motion picture theaters, and entertainment centers may locate only within the B4 Central Business District.[2] Additionally, these facilities, as well as massage parlors, rap parlors, and saunas cannot be located within 1,000 feet of a residentially zoned district or within 500 feet of a church, state licensed day care facility, public library, or a school serving people under the age of 18.[3] The locations of these facilities is further limited in that only one adult use is allowed per block face.

Plaintiffs Ferris Alexander and U.S. Video filed this action seeking a declaratory judgment that the amendment to section 540.410 of the Minneapolis Code of Ordinances is unconstitutional. They requested

---

1. Section 540.410 is reproduced in its entirety as the Appendix to this order.

2. Adult theaters are further restricted in that other sections of the zoning code combine to limit them to the B4S and B4C subdistricts.

3. Although massage parlors, rap parlors, and saunas theoretically can locate anywhere in the city, the practical effect of these distance requirements is to limit them to locations within the B4 District.

a temporary and permanent injunction against the enforcement of section 540.410, and their reasonable costs, disbursements, and attorney's fees. At the hearing for a preliminary injunction on December 1, 1988, the City of Minneapolis agreed not to enforce the ordinance until this lawsuit was adjudicated on its merits. Plaintiffs thereupon withdrew their motion for a preliminary injunction. The case came on for trial on the merits before this court on March 13, 1989. At the conclusion of trial, the parties agreed to submit their final arguments in written form, and have now done so. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, after considering all the testimony and exhibits received at trial, as well as the arguments and memoranda of counsel, the court hereby makes these findings of fact and conclusions of law.

## II. CLAIMS OF THE PARTIES.

Plaintiffs claim that section 540.410, as amended, is unconstitutional for a variety of reasons. Their first claim is that the ordinance constitutes an unlawful prior restraint on the rights of freedom of speech and of the press in violation of the First and Fourteenth amendments. They claim this restraint is unconstitutional for either of two reasons. First, the lawmakers acted with impermissible intent in passing the ordinance. Plaintiffs claim the true intent of the Council was to rid the city of adult businesses because of their content, not to curb the secondary effects of the businesses. It is argued that this intent is evident from the contradictions found between the statement of purpose of the ordinance and the actual effect it has, as well as the fact that the adult uses are the only ones in the entire Minneapolis code where existing uses are not "grandfathered in." Plaintiffs also claim the impermissible intent is shown in the legislative and litigative history of the ordinance.

A second attack on the ordinance is that it is an unconstitutional prior restraint because of its effect. Plaintiffs claim the forced closure of their businesses, combined with the fact that there is no reasonable opportunity for relocation of these businesses, will greatly reduce the public's access to constitutionally protected speech.

The basis for another attack on the ordinance is that it is unconstitutionally vague. Plaintiffs claim the language of the ordinance does not allow them to determine whether or not they are covered by the ordinance, and if they are covered, what they would need to do to come into compliance with it.

Lastly, plaintiffs claim the ordinance violates the equal protection clause in that the adult businesses defined in the ordinance are treated differently than other businesses. The differing treatment is evident in two ways. First, these adult businesses are the only non-conforming businesses in the entire city zoning code which are amortized out of existence. Second, there is no rational basis for treating these adult businesses differently than businesses which feature identical nude entertainment but sell liquor.

Defendant counters these claims by relying heavily on the Supreme Court decision of *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The city claims that the ordinance is a content neutral ordinance with a plainly stated purpose—to control the secondary effects associated with adult use businesses. It also claims that the issue is not whether the ordinance makes it economically more difficult for plaintiffs to operate, but whether the ordinance allows these businesses some area in which to locate. The city claims there are over 200 potential locations for these businesses within the B4 district, thus giving plaintiffs more than a reasonable opportunity to present the constitutionally protected speech. Defendant also claims there is no proper plaintiff to challenge the vagueness of the ordinance, and alternatively denies that the ordinance is vague or that it violates the equal protection clause.

## III. FINDINGS OF FACT.

Plaintiff Ferris Alexander is a Minnesota citizen who presently owns five adult bookstores and two adult theaters within the

City of Minneapolis. Plaintiff U.S. Video, Inc., is a Minnesota corporation engaged in business in the City of Minneapolis.

The primary witness who testified regarding the ordinance was William Nordrum, Jr. Nordrum has been the Minneapolis zoning supervisor since 1965. He identified the type and number of adult uses which would be non-conforming under section 540.410. Prior to the 1986 amendment, there were nine adult bookstores within the City of Minneapolis. Under the new ordinance, five or six of these would be forced to close.[4] One bookstore has since closed, and one new bookstore was opened. Therefore, if none of the closed businesses relocated, the city would be left with three or four adult bookstores under the new ordinance.

The effect on the adult theaters is as follows. Prior to the ordinance, there were three adult theaters in the city. One of these was forced to close due to a condemnation action unrelated to section 540.410. Therefore, only two adult theaters exist which would be affected by the ordinance. Both these theaters are outside the B4 District and have been ordered closed.

In addition to these adult bookstores and theaters which would be forced to move, several other adult businesses would be forced to move into the B4 District or close as a result of the ordinance. Six adult health clubs are located within the city, three of which were ordered to close or relocate. One rap parlor existed at the time of the ordinance, which was ordered closed. "Adult saunas" were also affected

by the ordinance. Nine existed in 1986, seven of which were ordered to close or relocate.[5]

As stated above, the city listed these facilities as ones which would have to close or relocate under the new ordinance. An exception to this "close or move" rule is contained in section 540.410(f). That subsection allows the zoning administrator to recommend that certain businesses be given extensions as to the date to relocate or close. Nordrum testified that such extensions would be granted only if it were necessary to allow the owner to recover his initial investment and no alternative uses existed for the premises. No such extensions were requested or granted.

Nordrum also explained the city's interpretation of several aspects of the ordinance. One of these interpretations concerned the definition of an "adults-only bookstore."[6] He stated that the zoning office has not come up with an exact figure to decide when a business does a "substantial or significant portion of its stock in trade" in adult material. That determination is made by field trips to the facility and general observations about how the items are stocked and displayed. He testified that the bookstores given notice had "by far a majority" of their materials dealing with adult materials, but no guideline was set as to what percentage of stock or volume in trade would constitute "substantial or significant." Nordrum also testified that the city has determined that video stores do not come under the definition of an adults-only bookstore. The reason for

4. The number is uncertain because it is not clear whether the Broadway Book facility is within 500 feet of a church. Apparently the zoning commission feels it is in a prohibited location, but the city attorney has issued an opinion letter that the business is arguably beyond 500 feet of that church. For the purposes of the instant action, the court will not decide whether the Broadway Book would or would not be within a prohibited area.

5. Nordrum also testified that there are several "therapeutic" sauna and massage facilities within the city of Minneapolis which were not included in his lists of adult facilities. Although no one challenged the differing treatment given "adult" and "therapeutic" massages, the court

sees no basis for such a distinction on the face of section 540.410.

6. Section 540.410(b)(1) reads as follows:

(1) *Adults-only bookstore:* An establishment having as a substantial or significant portion of its stock in trade, books, magazines, films for sale or viewing on premises by use of motion picture devices or other coin-operated means, and other periodicals which are distinguished or characterized by their principal emphasis on matters depicting, describing or relating to nudity, sexual conduct, sexual excitement or sadomasochistic abuse, as defined below, or an establishment with a segment or section devoted to the sale or display of such material, for sale to patrons therein.

this determination is that these facilities are engaged primarily in the rental of such products with infrequent sales, thereby not falling within the ordinance. However, Nordrum testified that if a video store segregated adults-only video tapes and did offer them for sale, they would "take a look at" the facility and determine whether to classify it as an adults-only bookstore.

Finally, Nordrum confirmed the fact that section 540.410(e) is the only section in the entire Minneapolis Code of Ordinances which provides for the amortization of nonconforming uses. Each and every other time the zoning code has been amended, all nonconforming uses are grandfathered in and given a variance, which variance continues, even upon subsequent sales of the property.

The trial also generated evidence regarding the areas available for adult businesses. The entire city consists of 37,568 acres.[7] The B4 Central Business District covers 375 acres and approximately 150 blocks. However, the entire area within this district is not available for use by adult businesses. Within or nearby the B4 District are at least 17 "triggering uses."[8] No adult business may locate within 500 feet of such a triggering use. The B4 District available for adult businesses is further limited in that the southeast corner of the district is within 1000 feet of a residential area.

Evidence was also received regarding the current availability of locations for adult businesses in the B4 District. One source of this information was Carolyn Stark, who is a relocation counselor for the Minneapolis Community Development Agency. Ms. Stark's job is to relocate businesses after condemnation actions have forced them out of their prior locations in the city. In connection with her job, she attempted to relocate an adult bookstore owned by Alexander located at 614616 Hennepin Avenue. That bookstore was condemned as part of a redevelopment plan of the city. Ms. Stark helped Alexander look for a relocation spot from January to September,

1988. In that time she forwarded to Alexander the addresses of eight available spaces which could legally house an adult business under the 1986 amendments. Alexander testified that many of these buildings did not meet his relocation requirements, but he did try to lease or purchase each of them. These efforts were fruitless, as none of the owners would lease or sell to him because of the nature of his business.

Further testimony regarding the characteristics of the B4 District and the availability of retail space in it was provided by Al Carufel. Mr. Carufel had prepared a report at the request of plaintiffs' counsel which was put into evidence as Plaintiffs' Exhibit 32. The gist of that report is that he found 14 locations in the B4 District which were available for an adult business. Alexander again testified that he approached the owners of these buildings and that none would sell or rent to him.

Finally, Alexander also testified that he attempted to obtain relocation sites by himself. He approached several owners about buying a building to house his businesses. Only one owner offered to sell. The asking price for that building, located at 33 South 5th Street, was $3.5 million. Alexander stated it would take an additional $1 million to remodel the building, and at that cost, it was impossible for him to operate a viable business. Alexander further testified that he owns five bookstores in Minneapolis. These bookstores have been in existence between eight and 25 years. In four of the five bookstores, Alexander owns the building as well as the business. In the fifth bookstore, his wife owns the building. Alexander owns the buildings because he has found if he does not, the owners often refuse to renew his lease. Alexander also owns two adult theaters, the Franklin and Rialto. Again, he owns the buildings as well as the business, and has operated these theaters for some 20 years.

In addition to his Minneapolis holdings, Alexander also owns bookstores in Duluth.

7. This figure was not put in at trial, but the court takes judicial notice of the fact.

8. A triggering use is one described in section 540.410(c)(2), e.g., a church or day care facility.

The City of Duluth recently passed an ordinance which limited the amount of adult merchandise in these stores to 30 percent of its entire stock. Alexander has had no problems complying with the terms of that ordinance for the year he has operated under it. However, he testified that because he was given no guidance as to what percentage of material would be allowable under the Minneapolis ordinance, he could not alter the Minneapolis stores' inventory in order to comply with the ordinance.

Finally, Scott Sarkis, a representative of U.S. Video, testified. He stated that U.S. Video is engaged in the rental and sale of tapes, some 30 percent of which are classified "adults-only." These adults-only tapes are displayed in a separate room and are sold to customers. Other testimony showed that several other video stores in the city operate in the same manner.

## IV. LAW.

The central claim of the plaintiffs in this case is that the ordinance violates their First Amendment rights. All parties agree that plaintiffs, in operating their bookstores and theaters, are protected by the First and Fourteenth Amendments to the United States Constitution. *Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (bookstores); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (theaters). When regulations such as the one in question impinge on such protected businesses, they must be subjected to the analysis set out by the Supreme Court in *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1975), and more recently in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

At first glance, the Minneapolis ordinance seems to make distinctions based on the content of the materials provided, and therefore subject to strict scrutiny. However, this ordinance, like the ones found in Renton and Detroit "does not ban adult theaters altogether.... The ordinance is therefore properly analyzed as a form of time, place, and manner regulation." *Renton,* 106 S.Ct. at 928.

■ An ordinance which operates as a time, place, and manner regulation still must pass constitutional muster. Such ordinances are acceptable if they are "designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." *Id.* The analysis regarding the constitutionality of such ordinances, therefore, has two prongs, the first prong is whether the ordinance is designed to serve a substantial government interest.

■ It is settled law that a city's interest in preserving the quality of its urban life is important and substantial, and one which must be accorded the highest respect. *See American Mini Theatres,* 427 U.S. at 71, 80, 96 S.Ct. at 2452, 2457. Therefore, if a city's purpose is to control the secondary effects of certain businesses, that is a substantial interest. *Id.* Given this fact, the duty of the court is to divine the real intent of the city in enacting the ordinance. If the predominate intent of the city is to control the secondary effects, the fact that suppression of speech may be a partial motivating factor is inconsequential. *Renton,* 106 S.Ct. at 929. However, if the intent of the city is really to enact content-based restrictions, they may not use a valid purpose as a pretext for those invalid purposes. *See Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 708, 106 S.Ct. 3172, 3178, 92 L.Ed.2d 568 (1986) (O'Connor, J., concurring). The reviewing court must be careful, however, because courts are not to strike down a statute on the basis of an alleged illicit legislative motive. *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968).

■ If the court finds the government does have a legitimate, non-pretextual interest in passing an ordinance, it advances to the second prong of the analysis: whether reasonable alternative avenues for the protected speech exist. The determination of a "reasonable alternative" is not subject to exact definition. It is clear that cities "must be allowed a reasonable opportunity to experiment with solutions to admittedly

serious problems." *American Mini Theatres,* 427 U.S. at 71, 96 S.Ct. at 2453. Additionally, the enacting city may rely on the experiences of other cities and the studies done by those cities when it enacts its own zoning ordinance. *Renton,* 106 S.Ct. at 931. This is true even if the solution it chooses to deal with the problem is different than the method chosen by the city which conducted the original study.

In both Supreme Court cases which addressed such zoning ordinances, reasonable alternative avenues were found to exist. In *American Mini Theatres,* it was made clear that the ordinance did not impose a limit on the total number of adult theaters in the City of Detroit. The Court stated that "[v]iewed as an entity, the market for this commodity is essentially unrestrained." 427 U.S. at 62, 96 S.Ct. at 2448. Justice Powell's concurrence also made it plain that alternative avenues for communication were essential to the validity of the ordinance. He stated that the First Amendment requires "full opportunity for expression in all its varied forms." *Id.* at 76, 96 S.Ct. at 2455. The Detroit ordinance was valid then, at least in part, because there was no indication that the ordinance in any way restricted the access to, or limited the number of, adult movie theaters in the city.

The *Renton* ordinance also dealt with the alternatives open to operators of adult theaters under a zoning ordinance. The ordinance in question banned the theaters from most locations in the city, but still left the theaters with 520 acres in which to locate. This 520 acres constituted over five percent of the entire land available in the city. That land was in all stages of development and accessible by freeways, highways, and roads. The theater owners claimed that the land was not commercially viable, but the Court held that the city need not guarantee these businesses a place to locate at bargain prices. The Court stressed that "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Renton,* 106 S.Ct. at 932.

Besides the Supreme Court decisions, at least two Circuit Courts of Appeals have addressed the issue of whether city zoning ordinances have left adult businesses "reasonable alternatives." In *Alexander v. City of Minneapolis,* 698 F.2d 936 (8th Cir.1983) (Alexander I), the court held that a Minneapolis ordinance which left only 12 legally permissible relocation sites for adult businesses unconstitutionally restricted the public's access to protected speech. More recently, *Walnut Properties, Inc. v. City of Whittier,* 861 F.2d 1102 (9th Cir. 1988) also held an ordinance unconstitutional. In that case, the ordinance would have forced the only adult theater in Whittier out of business with no definite prospect of a place to relocate. In holding the ordinance unconstitutional, the court noted that "there is nothing in the *Renton* opinion which indicates that the Court would uphold an ordinance which would eliminate all adult businesses in existence at the time the ordinance was passed." *Id.* at 1110.

It is with the guidance of the above referenced cases that this court must address the intent behind, and effect of, the amendment to the Minneapolis zoning ordinance.

## V. ANALYSIS.

As was the case in *Alexander I,* 531 F.Supp. 1162 (D.Minn.1982), the present ordinance theoretically leaves plaintiffs with several alternatives. First, they could request an administrative extension as described in section 540.410(f). The court finds from the testimony that such an extension would not be granted. The second alternative is that plaintiffs restructure their business so as to not fall within the definition of "adults-only" bookstores contained in section 540.410(b)(1). Plaintiffs could do this by reducing the amount of their adult materials below "a substantial or significant portion of its stock" and disbursing the material throughout the store so that it would not be clustered in a separate segment or section.

Alexander testified that he has no idea as to how much stock he would be able to retain and not run afoul of the ordinance.

Although Alexander's stores obviously fall within section 540.410(b)(1) now, the possibility he would reorganize is bolstered by the fact that in Duluth, which has an ordinance allowing a set percentage of materials per store to be adult oriented, he has brought the stores into compliance with the law and operated them as such. Plaintiff U.S. Video's alternative is just as difficult. They do have a separate room dedicated to the display of adults-only material for sale, yet they have not been designated as an "adults-only bookstore." They have been given no assurances that they will not be categorized as such in the future.

The court agrees with plaintiffs in that the "substantial and significant" language in the ordinance is unconstitutionally vague. Nordrum's testimony highlighted the fact that no set percentage was used in making the determination of whether a business falls within the ordinance. It seems that the inspectors merely eyeball a location and see how it feels. This subjective classification system may explain why video stores, though seeming to fall within the literal language of section 540.410, have not been classified as adult businesses. This "intuitive" method of classifying businesses, though similar to Justice Stewart's "I know it when I see it" test, strikes the court as inherently violative of due process. The option of Alexander's re-inventorying his bookstores so as not to fall within the definition found in section 540.-410 is, therefore, not realistically possible.

In light of the infeasibility of the first two alternatives, both adult theaters in Minneapolis and four or five of the existing eight bookstores would be left with the same alternatives they had in *Alexander I:* "close or move." 531 F.Supp. at 1170. It is with these two options in mind that the court proceeds to the determination of plaintiffs' First Amendment challenge to the ordinance.[9]

### 1. *Intent of the City Council.*

■ As the Supreme Court in *Renton* observed, a zoning ordinance such as the one in question will be treated as a legitimate time, place, and manner regulation if the predominant intent of the ordinance is to control the adverse secondary effects caused by such uses. *Renton,* 106 S.Ct. at 929. Plaintiffs' first challenge to section 540.410 is that the city's purpose is not to control these secondary effects. Plaintiffs claim that the legislative and litigative history behind the ordinance shows that the city council cared only about the content of the materials provided by these businesses, not the secondary effects of them.

The ordinance itself states that its purpose is to curb the "serious objectionable operational characteristics" of certain businesses which have a "deleterious effect upon the use and enjoyment of adjacent areas." Minneapolis Code of Ordinances, Section 540.410(a). The city viewed these regulations as necessary so "that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood." *Id.* Clearly, the stated purpose of the ordinance is to deal with the secondary effects of the regulated uses.

Plaintiffs recognize that the stated purpose of the ordinance is permissible, but contend that this stated purpose is a sham. However, the court must address this allegation using the "familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968). Plaintiffs claim that the true purpose is evident from the contradiction between the fact that the harm designated by the ordinance is a concentration of these businesses, yet the ordinance acts to concentrate the businesses in one area, the B4 Central Business District. The court finds, however, that the declared purpose of the ordinance and the method sought to achieve that purpose are not contradictory. In the September 25, 1986,

---

**9.** In light of the finding that the ordinance is unconstitutionally vague, the court could cease its analysis. However, as an alternative holding, it will go on to address the First Amendment issues.

Report of the City Planning Commission ("Report"), concern is shown for the effect these adult facilities have on the strip and neighborhood commercial areas. In order to combat these effects, the council chose to zone those uses into "a part of the city that is best able to withstand the adverse use impacts that come with them." Report, p. 2. The rationale of the Commission was that the downtown area was best able to "buffer" the impact of adult uses on surrounding properties. This idea of limiting adult businesses to one district, but disbursing them within that district, can therefore be seen as an attempt to avoid the very harms which are pointed out in the *Purpose* section of the ordinance. As the Supreme Court has noted, a "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. at 2453. This court finds that Minneapolis' "concentrate and disburse" experiment is reasonable, and that it does not show an intent to restrict the businesses based on the content of its materials.

Plaintiffs also claim that the city's impermissible intent is shown by various statements made by individuals to the city council and the history of restrictions on these businesses. The court disagrees with this. It finds that the isolated comments of various individuals do not outweigh the legitimate purposes stated in the ordinance itself and in the underlying reports regarding that ordinance. Plaintiffs' attack on the ordinance based on impermissible intent, therefore, fails.

### 2. *Effect.*

█ Besides having a legitimate purpose, a valid time, place, and manner regulation also must not unreasonably limit alternative avenues for communication. *Renton*, 106 S.Ct. at 928; *Alexander I*, 698 F.2d 936 (8th Cir.1983) (ordinance cannot greatly suppress access to adult theaters and bookstores).

In the two Supreme Court cases addressing this issue, the Court both times found that reasonable alternatives existed. Al-

though this issue was not discussed at length in *American Mini Theatres*, Justice Stevens noted that there were "myriad locations in the city of Detroit" available for the location of adult businesses. *American Mini Theatres*, 427 U.S. at 71, n. 35, 96 S.Ct. at 2453, n. 35. In *Renton*, the Court dealt with an ordinance which closed no adult theaters, but limited future locations to an area which encompassed 520 acres, or over five percent of the entire city area. That area included land in all stages of development which was crisscrossed by freeways, highways, and roads. *Renton*, 106 S.Ct. at 932. The possible locations for adult theaters within that five percent of the city's land was held to constitute a reasonable alternative avenue of communication.

The question of whether an ordinance allows for reasonable alternatives for communication of protected speech necessarily involves factual determinations. The language of an ordinance and the particular fact situation in that city must be analyzed in combination. It is possible that due to a city's particular situation, an identically worded ordinance may be legitimate in one city, but unreasonable in another.

Several things are worth noting about the Minneapolis ordinance which distinguish it from the ordinances in Renton and Detroit. Most notably, the Minneapolis ordinance not only prescribes where new adult facilities can locate within the city, it also closes several adult businesses which have been in existence for as many as 25 years. The fact that these businesses are forced to close does not automatically invalidate the Minneapolis ordinance. However, if these businesses are closed, without allowing them reasonable alternatives as to where to reopen, the ordinance would have "the effect of suppressing, or greatly restricting access to, lawful speech." *American Mini Theatres*, 427 U.S. at 71, n. 35, 96 S.Ct. at 2453, n. 35. The question of whether access to protected speech is suppressed or restricted by this ordinance necessarily depends on whether reasonable relocation possibilities exist for the protected businesses forced to shut down. *See Alexander I*, 698 F.2d at 938.

The court finds that such reasonable avenues are not available because of the combination of two facts. First, the area theoretically open to adult businesses is very limited. Second, the actual locations available within that area do not provide reasonable possibilities for relocation.

The first drawback to the ordinance is the limited potential area for the relocation of plaintiff's businesses. The 1986 amendments limit adults-only businesses to the B4 Central Business District.[10] The B4 District encompasses 375 acres. The total land area of the City of Minneapolis is 37,568 acres. Theoretically then, less than one percent of the entire city area is available for adult business use (0.998 percent). In reality, the amount of available land is even less. Exhibit 23 is a map of the B4 District, shaded to show areas unavailable for location of adult businesses because of their proximity to triggering uses. No adult business may locate within 500 feet of such a use. Therefore, the percentage of land theoretically open to adult businesses is well below one percent.[11]

This figure is much lower than the percentage of land left open and available for adult theaters in Renton. In that city, over five percent of the entire land area was available for the development of adult theaters. It is possible that a percentage as low as that in Minneapolis, in light of *Renton*, is invalid in and of itself. On the other hand, such a low percentage could be valid if ample actual opportunities for relocation of adult businesses were available within that zone. However, the court need not decide that question as a matter of law, because it finds that under the Minneapolis ordinance, such opportunities for relocation are not available.

The relocation possibilities for Alexander's businesses were testified to primarily through three individuals: Carolyn Stark, Al Carufel, and Alexander. As stated previously, Ms. Stark worked in relocating plaintiff's condemned business from 614–616 Hennepin Avenue. In the nine months she looked, she found eight possible locations for Alexander. Alexander attempted to lease or purchase all of these buildings, and none of the owners would deal with him when they found out how he was going to use the premises. Similarly, Carufel testified that he found 14 spots available for sale or lease which were possible adult business locations.[12] Alexander attempted to lease or buy all of these locations as well. Additionally, Alexander searched for space on his own. Through all these efforts, only one owner was willing to sell or rent to Alexander. Alexander testified that that property, located at 33 South Fifth Street, was cost prohibitive, and additionally was not zoned for use as a theater.

The city did not contradict the testimony regarding the availability of locations to relocate plaintiff's businesses. Neither did it put on witnesses of its own to testify that reasonable alternative locations for adult businesses were available. Considering this evidence, or lack thereof, the court finds that the Minneapolis ordinance will result in the closing of several existing adult facilities, with no reasonable opportunity for them to relocate. Given that fact, the ordinance works to suppress and greatly restrict the access to protected speech and is unconstitutional.

---

**10.** As noted previously, the adult theaters are even further limited to the B4S and B4C segments of that district.

**11.** The court makes no pretensions as to mathematical genius but makes the following observations. For each full 500-foot radius circle within the B4 District, 17.21 acres of land becomes unavailable for adult uses (area of circle = $\pi r^2$ and there are 43,560 square feet per acre). The court feels that the shaded portions of Exhibit 23, plus the area on Nicollet Mall, easily represents ten full circles. The maximum available land within the District is, therefore, only 203 acres (375 total acres minus 172 acres). This represents 0.54 percent of the total land area of the city.

**12.** It should also be noted that Alexander may not be the only tenant vying for these locations. Testimony showed that three health clubs, one rap parlor and seven saunas would also be forced to relocate or close under the ordinance. If these businesses chose to relocate, they would also be competing for available "adult" space within the B4 District.

## VI. CONCLUSION.

Based on the foregoing,

IT IS ORDERED That:

1. The Clerk of Court is directed to enter judgment as follows:

IT IS ORDERED, ADJUDGED AND DECREED That:

1. The Minneapolis Code of Ordinances Section 540.410 is declared unconstitutional on its face and as applied to the plaintiffs.
2. The defendant, its agents, officers, employees and persons acting under its direction and control are hereby permanently enjoined from enforcing the provisions of Minneapolis Code of Ordinances Section 540.410 against theaters and bookstores by any means.
3. Defendant's counterclaim against plaintiff Ferris J. Alexander is dismissed with prejudice.

2. Any claim for an attorney's fee pursuant to 42 U.S.C. § 1988, shall be filed with this court no later than June 23, 1989.

### APPENDIX

540.410. Regulated uses. (a) *Purpose.* In the development and execution of this section, it is recognized that there are some uses which, because of their very nature, are recognized as having serious objectional operational characteristics, particularly when several of them are concentrated under certain circumstances thereby having a deleterious effect upon the use and enjoyment of adjacent areas. Special regulation of these uses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood. These special regulations are itemized in this section. The primary control or regulation is for the purpose of preventing a concentration of these uses in any one area. Uses subject to these controls are as follows:

Adults-only bookstores;
Adults-only motion picture theaters;
Adult entertainment centers;
Massage parlors;
Rap parlors;
Saunas.

(b) *Definitions.* Whenever used in this section, the following words or phrases shall have the meanings ascribed to them:

(1) *Adults-only bookstore:* An establishment having as a substantial or significant portion of its stock in trade, books, magazines, films for sale or viewing on premises by use of motion picture devices or other coin-operated means, and other periodicals which are distinguished or characterized by their principal emphasis on matters depicting, describing or relating to nudity, sexual conduct, sexual excitement or sadomasochistic abuse, as defined below, or an establishment with a segment or section devoted to the sale or display of such material, for sale to patrons therein.

(2) *Adults-only motion picture theater:* An enclosed building used regularly and routinely for presenting programs, material distinguished or characterized by an emphasis on matter depicting, describing or relating to nudity, sexual conduct, sexual excitement or sadomasochistic abuse, as defined below, for observation by patrons therein.

(3) *Massage parlor:* An establishment or place primarily in the business of providing massage services.

(4) *Nudity:* The showing of the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.

(5) *Rap parlor:* An establishment or place primarily in the business of providing nonprofessional conversation or similar services for adults.

(6) *Sauna:* An establishment or place primarily in the business of providing (i) a steam bath and (ii) massage services.

(7) *Sexual conduct:* Acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's unclothed genitals, pubic area,

buttocks or, if such person be a female, her breast.

(8) *Sexual excitement:* The condition of human male or female genitals when in a state of sexual stimulation or arousal.

(9) *Sadomasochistic abuse:* Flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

(10) *Adult entertainment center:* An enclosed building or a part of an enclosed building, no portion of which enclosed building is licensed to sell liquor, which contains one or more coin-operated mechanisms which when activated permit a customer to view a live person unclothed or in such attire, costume or clothing as to expose to view any portion of the female breast below the top of the areola, or any portion of the pubic hair, anus, cleft of the buttocks, vulva or genitals, or the charging of any admission or fee for the viewing of any such activity.

(c) *Location restrictions.*

(1) *Adults-only bookstores, adults-only motion picture theaters, and adult entertainment centers.* No adults-only bookstore, adults-only motion picture theater or adult entertainment center shall be operated or maintained except within the B4 Central Business District. However, none of the above uses shall be permitted on any property with its main public entrance on Nicollet.

(2) *All regulated uses.* No adults-only bookstore, adults-only motion picture theater, adult entertainment center, massage parlor, rap parlor or sauna shall be operated or maintained within one thousand (1,000) feet of a residentially zoned district, and within five hundred (500) feet of a church, a state-licensed day care facility, established prior to November 1, 1986, public library, and public educational facilities which serve persons age seventeen (17) or younger, an elementary school or a high school. Only one of the above regulated uses shall be allowed per block face. Provided, further, that no adult entertainment center shall be permitted to locate except within the B4 Central Business District after December 20, 1985.

(d) *Measurement.* The distance limitations in subsection (c) shall be measured in a straight line from the main public entrances of said premises, or from the lot lines of properties in residentially zoned districts.

(e) *Amortization of nonconforming uses.* Establishments in violation of subsection (c) shall be permitted by section 532.20 as a nonconforming use. As to those establishments which have a nonconforming use status, the provisions of sections 532.20 through 532.100 shall apply and, in addition, such use shall become unlawful on and after December 1, 1988.

(f) *Investigation of existing uses.* Prior to July 1, 1987, the zoning administrator shall cause to be investigated the status of every adults-only bookstore, adults-only motion picture theater, adult entertainment center, massage parlor, rap parlor and sauna in the city, as to length of continuous operation and determine which uses would become unlawful on December 1, 1988. Appeals from the determination of the zoning administrator shall be pursuant to sections 534.40 through 534.60 and 534.200. The city council may, upon receiving the recommendation of the zoning administrator, extend said date where the appellant established that discontinuance of the use on December 1, 1988, results in a taking of a valuable property interests held by the appellant on the effective date of this section without the payment of just compensation.

(g) *Sign requirements for all uses.* All new regulated uses, and all existing regulated uses by December 1, 1988, shall comply with the following sign requirements:

(1) All signs shall be flat wall signs.

(2) The amount of allowable sign area shall be one square foot of sign area per foot of lot frontage on a street.

(3) No merchandise or pictures of the products or entertainment on the premises shall be displayed in window areas or any area where they can be viewed from the sidewalk in front of the building.

(4) Window areas shall not be covered or made opaque in any way. No signs shall be placed in any window. A one square foot sign may be placed on the door to state hours of operation and admittance to adults only. (77–Or–110, § 1, 5–13–77; 83–Or–318, §§ 1–4, 12–16–83; 85–Or–234, § 1, 12–20–85; 86–Or–266, §§ 1–7, 11–7–86).